**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 09-cv-00715-WJM-MJW

A.B. a minor, through her parent and next friend, B.S., and
B.S., individually,

      Plaintiffs,

v.

ADAMS-ARAPAHOE 28J SCHOOL DISTRICT;
AURORA PUBLIC SCHOOLS BOARD OF EDUCATION;
JOHN L. BARRY, Superintendent, in his individual and official capacity;
LAURA MUNRO, Director, Exceptional Student Services, in her individual and official capacity;
BARBARA RICE, Elementary/Preschool Consultant in her individual and official capacity;
JEAN BURKE, Principal, in her individual and official capacity;
VICKI MICHAELS, Special Education Teacher, in her individual and official capacity;
DONNA TROWBRIDGE and ODESSA HUBBARD, Paraprofessionals, in their individual and official capacities,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

---

In this civil rights action, Plaintiffs A.B., a minor, and her parent, B.S., bring a

multitude of federal and state law claims against current and former employees of the

Adams-Arapahoe School District related to A.B.'s treatment while a student at Lansing

Elementary School.  Before the Court are the following motions: (1) Defendant Donna

Trowbridge's Motion for Summary Judgment (ECF No. 74); (2) Defendant Vicki

Michaels's Motion for Summary Judgment (ECF No. 76); and (3) the Motion for

Summary Judgment filed by Defendants Adams-Arapahoe School District 28J, Aurora

Public School Board of Education, John Barry, Jean Burke, Barbara Rice, Odessa Hubbard, and Laura Munro (collectively the "Motions").[1]  For the reasons set forth below, the Motions are granted in part and denied in part.

## I.  STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  See *White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir.1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

Where the moving party does not have the burden of production at trial, the movant must demonstrate the absence of sufficient evidence in the record to establish

---

[1]  Defendant Ralph Albertson was previously dismissed from this action by stipulation of the parties.  (ECF No. 60.)

one or more elements of each challenged claim or defense.  The burden then shifts to

the respondent to come forward with sufficient competent evidence to demonstrate a

genuine dispute of material fact with regard to each challenged element.  If the

respondent fails to produce sufficient competent evidence that, if accepted by the

factfinder, would establish its claim or defense, the claim or defense must be dismissed

as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## II.  FACTUAL BACKGROUND

The facts of this case are highly disputed.  However, on the instant Motions, the

Court must view the facts in the light most favorable to Plaintiffs.  *Walker v. City of*

*Orem*, 451 F.3d 1139, 1155 (10th Cir. 2006).  Accordingly, for purposes of the pending

Motions, the facts are as follows:

Plaintiff A.B. has been diagnosed with a seizure disorder and developmental

delays.  (Levisohn Dep. at 28, 40.)  In April 2006, the Adams-Arapahoe 28J School

District ("District") performed an evaluation of A.B. and determined that she was eligible

for special education services.  (ECF No. 79-19.)  In the fall of 2006, A.B. was a

kindergarten student in Lansing Elementary School's Life Skills program, which serves

students with severe and profound needs, including medically fragile students.  (Hall

Dep. at 17; Burke Dep. at 33.)   Vicki Michaels was the lead teacher in the Life Skills

program; LeDeanna Lloyd, Odessa Hubbard, and Donna Trowbridge were

paraprofessionals in the program.  (Burke Dep. at 33; Hubbard Dep. at 12-13; Michaels

Dep. at 33.)  Jean Burke was principal of Lansing Elementary.  (Burke Dep. at 13.)

Barbara Rice was a consultant employed by the District to develop programming and

provide oversight for the Life Skills program.  (Rice Dep. at 22-24.)  Laura Munro was the District's Director of Student Achievement for Diverse Learners and John Barry was the District's Superintendent.  (Munro Dep. at 12; Barry Dep. at 10.)

At Lansing, A.B. had significant behavioral difficulties.  (Lloyd Dep. at 40; Michaels Dep. at 65-69.)  Therefore, early in the school year, Consultant Rice spent two days in the Life Skills classroom working one-on-one with A.B.  (Rice Dep. at 41.)  After determining that A.B. was acting out to seek attention from the adults in the room, Rice developed a three-stage behavior modification plan (the "Plan").  (*Id.*)  The staff was first to send A.B. to sit in a regular chair for a time-out.  If A.B. would not comply and stay seated, the staff was to utilize a modified "baskethold", which involved the teacher sitting behind the chair and loosely holding A.B. down to help her try and stay still.  If A.B. had not deescalated her behavior in five minutes, the teachers were to place A.B. in a wooden high-backed chair (the "Restraint Chair") and strap A.B. to the chair.  The staff was then to set a timer so that A.B. would be in the Restraint Chair for no longer than five minutes.  (*Id.* at 42-43.) The purpose of the Plan was to get A.B. to refocus on classroom activities.  (*Id.* at 61.)  Rice did not intend for the Restraint Chair to be used punitively.  (*Id.*)  Rice trained Lead Teacher Michaels on the Plan; Michaels regarded the Plan as "district policy."  (*Id.* at 67-69, 87-88.)

Though A.B. had an Individualized Education Plan ("IEP"), the Plan was not a part of the IEP.  A.B.'s IEP talked about the use of "time outs" but did not mention restraining A.B. or using a strap to hold her in a chair.  (Rice Dep. at 67.)  Around the time that the Plan was designed, Rice had a meeting with A.B.'s mother, B.S.  (B.S. Dep. at 78.)  Rice explained that they were going to use a device similar to a high chair

with A.B. in the classroom, that A.B. would come to regard the chair as her "special place", and that A.B. would be allowed to participate in classroom activities while in the chair.  (*Id*. at 78-81.)  There was "not much talk of" straps and there was no mention of the term restraint.  (*Id*. at 81-82.)  At this meeting, B.S. wrote the following: "I give promission [sic] for teacher to use hight [sic] with strap."[2]  (ECF No. 110-1.)

Between early September and October 10, 2006, A.B. was strapped into the Restraint Chair on a daily basis.[3]  (Lloyd Dep. 16-17.)  Michaels was almost always the person who put A.B. into the Restraint Chair.  (Lloyd Dep. at 21.)  A.B. would be let out of the Chair to go to "specials" such as art and physical education, which were about 30 to 45 minutes long.  (Lloyd Dep. at 22.)  However, while A.B. was in the Life Skills classroom, she was strapped into the Restraint Chair from shortly after she arrived until about five minutes before her mother returned to pick her up.  (Lloyd Dep. at 22-23.)  Paraprofessional Lloyd saw A.B. run around the classroom on two or three occasions but otherwise could not recall any particular behavior that precipitated Michaels putting A.B. into the Restraint Chair.  (*Id*. at 40.)  Lloyd believed that Michaels restrained A.B. because she "just didn't like the child."  (*Id*. at 17.)

When A.B. was in the Restraint Chair, straps were placed around her waist and her chest.  (Lloyd Dep. at 20.)  Sometimes A.B.'s arms were free (Lloyd Dep. at 20) and sometimes they were strapped to her sides.  (Trowbridge Dep. at 44.)  A.B. frequently

---

[2]  The Court notes that B.S. emigrated to the United States from Laos and that English is not B.S.'s first language.  No translator was present at the meeting with Rice.

[3]  The Court notes that the frequency with which the Restraint Chair was used is hotly disputed by the parties.  However, the Court must take the facts in the light most favorable to the Plaintiffs on the instant Motions.

cried while she was in the Restraint Chair.  (Lloyd Dep. at 33.)  In response to A.B.'s

crying, Michaels would raise her voice and tell A.B. to "shut up." (Lloyd Dep. at 33, 42.)

Two or three times a week, Michaels would turn the Restraint Chair so that it faced

away from the rest of the class and would erect barriers behind and to the side of A.B.

(Lloyd Dep. 34.)  The staff could see over the barriers but A.B. could not see out.

(Trowbridge Dep. at 46.)

 Between early October and mid-December 2006, A.B. was strapped into the

Restraint Chair on four or five occasions for anywhere from approximately five minutes

to a maximum of about forty minutes.  (Trowbridge Dep. 43, 92-95; Hubbard Dep. 12-

13; Michaels Dep. 63, 92.)  The parties dispute who put A.B. into the Restraint Chair

but, at most, Paraprofessionals Trowbridge and Hubbard each placed A.B. into the

Chair once or twice. (Hubbard Dep. at 35-36; Baskfield Aff. ¶ 17.)  Again, Michaels was

the primary user of the Restraint Chair.

During this time frame, when A.B. was put in the Restraint Chair, her arms were

strapped to her sides and the Restraint Chair was placed in the corner of the classroom

with high barriers around it so that A.B. could not see out but the teachers could see in.

(Trowbridge Dep. at 44-46.)  A.B. yelled and cried while in the Restraint Chair.  (*Id.* at

44-45.)  On one occasion, Michaels refused to let A.B. out of the Restraint Chair

despite the fact that she said she needed to "go potty."  (*Id.* at 78-79.)  Trowbridge

believed Michaels used the Restraint Chair for punitive purposes.  (*Id.* at 90.)

Aside from the Restraint Chair, A.B. was also sometimes placed in a red high-

backed chair with a removable tray akin to a high chair.  (Michaels Dep. at 54-58;

Trowbridge Dep. at 106-07.)  A.B. was not strapped into the high chair.  (Michaels Dep.

at 54.)   The high chair was used to keep A.B. engaged in the activity at hand; it was not used for punitive purposes.  (Trowbridge Dep. at 206.)

Lloyd, Hubbard, and Trowbridge were all troubled by Michaels's use of the Restraint Chair.  The second day the Restraint Chair was used, Lloyd personally spoke with Principal Burke and told her about the Chair.  (Lloyd Dep. at 23-24.)  Burke promised to check out the situation.  (*Id*. at 24.)  After that initial meeting, Lloyd had over a dozen face-to-face conversations with Burke about "what was going on in the classroom".  (*Id*. at 24-25.)  Sometime in November 2006, shortly after the first time she observed the use of the Restraint Chair[4], Trowbridge spoke with Burke about it. (Trowbridge Dep. at 81.)  Hubbard also went to Burke with her concerns.  (Hubbard Dep. at 69.)

In response to these complaints, Burke told the complainants that she would talk to Michaels about the use of the Restraint Chair.  (Trowbridge Dep. at 82.)  Burke did not investigate the complaints in any manner.  (Burke Dep. at 99-100.)  Burke did not personally confront Michaels about the use of the restraint chair or ask her to stop using it.  (Burke Dep. at 87-88.)

The paraprofessionals also spoke with Rice about the use of the Restraint Chair. A week or so after Michaels started using the Restraint Chair, Lloyd told Rice that Michaels was putting A.B. in the Chair the whole time she was in the Life Skills classroom. (Lloyd Dep. at 27.)  Lloyd reiterated her concerns with Rice on at least six or seven different occasions after that.  (Lloyd Dep. at 26.)  Rice responded that she

---

[4]  Trowbridge started working in Lansing's Life Skills classroom after Lloyd left in mid-October 2006.

would meet with Michaels.  Rice also said that the use of the restraint chair was "okay" because A.B.'s mother had consented.  (Lloyd Dep. at 26.)  In November 2006, Odessa Hubbard submitted a written complaint to Rice about how Michaels would strap A.B. into the restraint chair.  (Rice Dep. at 112.)  Trowbridge also expressed her concerns to Rice.  (Trowbridge Dep. at 98.)

Rice assumed Michaels was using the chair in accordance with the behavior Plan she had designed.  (Rice Dep. at 114-15.)   Rice did nothing to confirm that this assumption was true.  (*Id*.)  Based on this assumption, Rice chose not to speak with Michaels about the concerns expressed by the paraprofessionals.  (*Id*.)

In December 2006, Trowbridge contacted The Legal Center for People with Disabilities and Older People ("The Legal Center") about whether use of the Restraint Chair was appropriate.  (Trowbridge Dep. at 112-113.)  In response, The Legal Center launched an investigation.  Superintendent Barry received notice of The Legal Center's intent to investigate by letter dated December 13, 2006.  (Barry Dep. 10.)  Prior to receiving this letter, Barry had no knowledge of the use of the Restraint Chair at Lansing.  (Barry Dep. at 28-31.)  Director Munro was not informed about the use of the Restraint Chair until this lawsuit was filed in the spring of 2009.  (Munro Dep. at 42-43.)

Upon learning of The Legal Center's investigation, Burke instructed the Life Skills staff that it was not to use any kind of time-out chair that had a strap on it.  (Burke Dep. at 89-90.)  In January 2007, Rice learned that the Life Skills staff was still using the Restraint Chair so she personally went and removed the straps from the classroom. (Rice Dep. at 123-24.)  She informed the staff that it was not to use straps to restrain any student other than those that had issues with bodily control and for whom straps

-8-

were a part of their therapy regiment.  (*Id*. at 128-30.)

### III.  ANALYSIS

Plaintiffs' Second Amended Complaint brings twenty claims for relief: nine federal claims and eleven claims under Colorado state law.  The parties previously agreed to dismiss Plaintiffs' Eighth Claim for Relief which alleged a violation of the Individuals with Disabilities in Education Act.  (ECF No. 38.)  The parties do not appear to draw any meaningful distinction between the District and the Board of Education so the Court will consider the claims against these institutional parties simultaneously and interchangeably.  Thus, there are currently nineteen claims pending against eight Defendants.

Defendants move for summary judgment on all claims.  The Court will address each claim in turn below.

### A.     Official Capacity Claims

The Individual Defendants[5] move for dismissal of the claims brought against them in their official capacity as duplicitous of the claims brought against the District. (ECF No. 79 at 15.)  Plaintiffs do not respond to this argument.  The Supreme Court has held that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.  It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citation omitted).

The Court finds that Plaintiffs would suffer no prejudice from dismissal of the

---

[5]  The term "Individual Defendants" includes all seven Defendants other than the Board and the District.

official capacity claims because the District—who is the real party in interest—remains a party to this action.  The Court therefore finds that dismissal of the claims brought against the Individual Defendants in their official capacities is warranted as a matter of judicial economy and efficiency.  *See Smith v. Brevard County*, 461 F. Supp. 2d 1243 (M.D. Fla. 2006); *Smith v. Bd. of County Comm'rs*, 216 F. Supp. 2d 1209 (D. Kan. 2002); *McLin v. City of Chicago*, 742 F. Supp. 994, 997 (N.D. Ill. 1990) ("Because the [entity] is already a defendant, dismissing [the individual defendants] does not prejudice plaintiffs, and it clarifies and streamlines the pleadings.").  Accordingly, Plaintiffs' claims against the Individual Defendants in their official capacities are dismissed with prejudice.

**B.     Qualified Immunity**

The Individual Defendants assert qualified immunity from the claims brought against them in their individual capacities.  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223 (2009) (quotation omitted).  Resolution of a dispositive motion based on qualified immunity involves a two-pronged inquiry.  "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right."  *Id*. at 232 (internal citations omitted).  "Second, ... the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct."  *Id*.  "With regard to this second [prong], the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was

unlawful under the circumstances presented." *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008).  A reviewing court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Qualified immunity is applicable unless the plaintiff can satisfy both prongs of the inquiry.  *Id.* at 232.

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) (quotation omitted).  The Supreme Court has held that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful."  *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quotations and alteration omitted).  The Tenth Circuit has observed that "[t]he *Hope* decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional."  *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (quotations omitted).

With this general understanding in mind, the Court will now analyze Plaintiffs' constitutional claims.

C.      **Fourth Amendment**

Plaintiffs allege that Defendants violated A.B.'s Fourth Amendment right to be free from unlawful seizure by using the Restraint Chair.

The Fourth Amendment, applicable to the states through the Fourteenth Amendment's Due Process Clause, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  This prohibition against unreasonable seizures extends to civil, as well as criminal, seizures.  *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005).  "In carrying out searches and other disciplinary functions pursuant to [school] policies, school officials act as representatives of the State, . . . and they cannot claim . . . immunity from the strictures of the Fourth Amendment."  *New Jersey v. T.L.O.*, 469 U.S. 325, 336-37 (1985).

A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave."  *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).  There is no genuine dispute here that A.B. was seized when she was put into the Restraint Chair.  The only issue relevant for our purposes is whether that seizure was reasonable.

In the school context, the traditional Fourth Amendment reasonableness standard is somewhat relaxed.  *T.L.O.*, 469 U.S. at 341.  The Tenth Circuit has held: "To balance the students' privacy rights with the schools' custodial and tutelary responsibility for children, a seizure need only be justified at its inception and reasonably related in scope to the circumstances which justified the interference in the

first place." *Couture v. Board of Educ. of the Albuquerque Public Schools*, 535 F.3d 1243, 1250 (10th Cir. 2008) (citations omitted).  "A seizure is 'permissible in its scope when the measures adopted are reasonably related to the objectives of the [seizure] and not excessive[ ] . . . in light of the age and sex of the student and the nature of the infraction.' " *Id.* (quoting *T.L.O.*, 469 U.S. at 342). In determining whether a seizure is reasonable, the Court must consider the totality of the circumstances.  *United States v. Shareef*, 100 F.3d 1491, 1505 (10th Cir. 1996) (citation omitted).

<u>Donna Trowbridge and Odessa Hubbard</u>

Donna Trowbridge and/or Odessa Hubbard utilized a modified baskethold on A.B. nearly every day.  However, their involvement with the Restraint Chair was significantly less.  At most, Trowbridge and Hubbard may have put A.B. in the restraint chair once or twice and only for a few minutes each time.  (Baskefield Aff. ¶ 17; ECF No. 97-12.)  The evidence shows that, prior to these incidents, A.B. had been running around the classroom causing a disruption and endangering the more fragile students such as those with feeding tubes.  Thus, the use of the Restraint Chair was justified at its inception.  Moreover, as discussed more fully below, the scope of the restraint imposed by Trowbridge and Hubbard was reasonable.

For purposes of determining whether the seizures at issue here violated the Fourth Amendment, the key case in the Tenth Circuit is *Couture*, 535 F.3d 1243.  In *Couture*, the plaintiff was a disabled child with a behavior disorder that caused him to be disruptive and dangerous to himself and other students.  535 F.3d at 1253.  His IEP included permission by his mother to use a small, dimly-lit room adjacent to the

-13-

classroom as a timeout room for purposes of teaching him behavioral control.  *Id.* at

1251-52.  The student was placed in this timeout room when his behavior was violent or

disruptive and "for not following directions, giving angry looks, mimicking his peers, and

continuously talking."  *Id.* at 1253.  Sometimes the student would walk into the timeout

room on his own, but teachers often forced him into the room and barricaded the door

behind him.  *Id.* at 1247-48.  Teachers kept the student in the room until he had been

calm for five minutes, even if that meant he was in the room for over an hour at a time.

*Id.* at 1253.

The *Couture* court held that the school's use of the time out room did not

constitute an unreasonable seizure.  *Id.* at 1251.  The seizures were held to be justified

at their inception because "it was not unreasonable for the teachers to send [the

student] to a five-minute timeout in the hope of obtaining his cooperation in the future."

*Id.* at 1253.  Further, the seizures were related in scope because the "timeouts were

employed as a technique for behavioral modification, and the length of time was

determined accordingly."  *Id.*

Because the student's mother had authorized use of the timeout room, the court

reasoned that "[n]eglecting to follow the IEP—including failure to use the prescribed

timeouts—could have exposed the teachers to liability."  *Id.*  Although the timeouts

ultimately were ineffective and may have exacerbated the student's behavior, *id.* at

1251, they were held constitutional:

> This was primarily a pedagogical judgment . . . .  There is no
> allegation that the defendants acted maliciously, but only
> that they misjudged the circumstances.  Pedagogical
> misjudgments (even assuming these were misjudgments,

> we cannot say), do not, without more, expose teachers to
> liability under the Fourth Amendment.

*Id.* at 1254.  The Tenth Circuit observed:  "Unless the teacher's chosen method is patently unreasonable or blatantly not tailored to meeting the child's needs, we respect the teacher's choice."  *Id*. at 1255.

Under *Couture*, the Court finds that the seizures effected by Trowbridge and Hubbard were reasonable.  Both the use of the baskethold and the short-term use of the restraint chair were authorized by the Plan developed by Rice.  (Rice Dep. at 41-43.)  The modified baskethold was designed to help A.B. focus on the task at hand and, therefore, was tailored to meet her educational needs.  Short-term use of the Restraint Chair was also intended to help A.B. regain the focus necessary to participate in learning activities.  (*Id*.)  There is no allegation that either Trowbridge or Hubbard used the Restraint Chair for any significant length of time or that they used it for a punitive or malicious purpose.

Thus, the Court concludes that no reasonable jury could find that the seizures of A.B. effectuated by Trowbridge and Hubbard were unreasonable.  Therefore, Plaintiffs have failed to show a trial-worthy issue as to whether Trowbridge or Hubbard violated A.B.'s Fourth Amendment rights.  Because there was no constitutional violation here, the Court need not examine whether A.B.'s right to be free from restraint was clearly established.

Accordingly, the Motions for Summary Judgment filed by Defendants Trowbridge and Hubbard are granted in so far as they seek judgment in their favor on Plaintiffs' Fourth Amendment claims.

Vicki Michaels

Between early September and October 10, 2006, Michaels strapped A.B. into the Restraint Chair nearly her entire school day every day. (Lloyd Dep. at 16-17; 53.) A.B. was strapped into the chair from shortly after she arrived at school until approximately five minutes before her mother would pick her up. (Lloyd Dep. at 21-22.) She was released only to attend a special class such as art, music or PE; these special classes lasted from thirty to forty-five minutes. (Lloyd Dep. at 22-23.) A.B. would often cry while strapped into the chair and Michaels would raise her voice and tell A.B. to "shut up." (Lloyd Dep. at 33.) Lloyd could not recall any misbehavior that precipitated use of the Restraint Chair; Lloyd believes A.B. was restrained because Michaels "didn't like the child." (Lloyd Dep. at 17.)

A number of facts distinguish this case from *Couture*. Here, there was no mention of the Restraint Chair in A.B.'s IEP. (Rice Dep. at 67.) Though her behavior modification plan called for use of the Restraint Chair, the plan called for use of the Restraint Chair only when all other options had been exhausted and for a maximum of five minutes at a time. Michaels's use of the Restraint Chair went far above and beyond that which had been outlined in the Plan. Moreover, A.B.'s mother had not specifically consented to the use of the Restraint Chair.

The length and frequency of the restraint imposed by Michaels in this case is far greater than in *Couture*. There, the student was placed in the timeout room for approximately twelve hours over two and a half months. *Couture*, 535 F.3d at 1257. Here, it appears A.B. was oftentimes restrained for at least two hours a day, every school day for approximately six weeks. (Lloyd Dep. at 16-17; 22-23.) A.B. was

restrained approximately five times longer than the student in *Couture* which has a significant impact on the reasonableness analysis.

Finally, the evidence shows that A.B. was not always acting out when Michaels chose to restrain her. Lloyd testified that she never saw A.B. hit, kick or spit on anybody and only saw her run around the room on two or three occasions. (Lloyd Dep. at 40.) Yet Michaels put A.B. in the Restraint Chair every day for six weeks. Given these facts and circumstances, a reasonable juror could find that the seizures effectuated by Michaels were not justified at their inception. A reasonable juror could also find that keeping a five-year-old restrained for such a long period of time exceeds the constitutionally permissible scope of the restraint. Therefore, the Court finds that Plaintiffs have shown a trial-worthy issue as to whether Michaels violated A.B.'s Fourth Amendment rights. Because Plaintiffs have satisfied the first prong of the qualified immunity analysis, the Court must determine whether the constitutional violation was clearly established at the time of Michaels's actions. Initially, the Court notes that the unconstitutional restraint of A.B. occurred in fall 2006 and *Couture* was not decided until 2008. Thus, *Couture* is irrelevant for purposes of what the clearly established law was at the time of Michaels's actions.

Having reviewed the Fourth Amendment case law at the time of the disputed events, the Court finds that A.B.'s right to be free from unreasonable seizure was clearly established. Since at least 1985, it has been clear that students retain limited Fourth Amendment protections inside the school building. *See T.L.O.*, 469 U.S. at 338. In 2005, the Tenth Circuit held that the seizure of a student is constitutionally permissible if it is "justified at its inception" and "reasonably related in scope to the

circumstances which justified the interference in the first place." *Jones*, 410 F.3d at 1228. The Court finds that under this standard, a reasonable person in Michaels's position would have understood that her actions violated A.B.'s constitutional rights.

Because Plaintiffs have shown a trial-worthy issue as to whether Michaels violated a clearly established constitutional right, Michaels is not entitled to qualified immunity against Plaintiffs' Fourth Amendment claim. Michaels's Motion for Summary Judgment is therefore denied in so far as it pertains to Plaintiffs' Fourth Amendment claim.

Barbara Rice

Plaintiffs allege that Rice violated A.B.'s Fourth Amendment rights in three ways: (1) by personally restraining her; (2) by creating and implementing the behavioral plan that allowed A.B. to be strapped into the chair; and (3) by failing to adequately train and/or supervise Michaels. The Court will address each of these contentions below.

1.   Unlawful Restraint

The evidence shows that Rice restrained A.B. in a modified baskethold at least once. (Rice Dep. at 53.) A.B. was running around the room, hiding under desks and tables, and showing no regard for the medically fragile students in the classroom. (*Id.*) Rice put A.B. in a regular chair for time-out but when A.B. did not deescalate her behavior, Rice employed the modified baskethold. (*Id.* at 53-54.) There is no allegation that Rice ever personally strapped A.B. into the Restraint Chair.

On these facts, under *Couture*, no reasonable juror could find that Rice violated A.B.'s Fourth Amendment rights. The decision to use the modified baskethold was justified by A.B. behavior and was a pedagogical judgment. There is no evidence that

Rice's motivation in doing so was malicious.  Thus, Plaintiffs have not shown a trial-
worthy issue as to whether Rice's use of the modified basekthold on A.B. violated her
Fourth Amendment rights.

>        2.        Unconstitutional policy

It is undisputed that Rice created an escalating restraint plan to help Michaels
deal with A.B.'s behavioral issues.  Plaintiffs allege that this policy violated A.B.'s
constitutional rights.  To succeed on their unconstitutional policy claim, Plaintiffs must
show:  (1) that a municipal employee committed a constitutional violation; and (2) that a
municipal policy or custom was the moving force behind the constitutional deprivation.
*Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  The Court has already
found that Michaels's use of the Restraint Chair violated A.B.'s Fourth Amendment
rights.  Thus, the only issue is whether Rice's behavior Plan was the moving force
behind that violation.

The Tenth Circuit has held "it is safe to assume that specially-trained and
experienced teachers will know far more than we do about techniques best designed to
improve a child's behavior."  *Couture*, 535 F.3d at 1254.  The Court must "defer to a
teacher's expertise about how to manage disciplinary problems or inculcate appropriate
behavioral skills in his or her class" unless "the teacher's chosen method is patently
unreasonable or blatantly not tailored to meeting the child's needs."  *Id*. at 1255.  This
Plan was created after Rice spent two days in the classroom observing A.B. and
serving as her one-on-one paraprofessional.  (Rice Dep. at 41.)  After this experience,
Rice determined that A.B. was acting out primarily to get the staff's attention.  The
purpose of the Plan's continuum of restraint was to take away the adult attention to

allow A.B. to refocus on her learning.  (*Id.* at 42.)

The Court finds that, if properly implemented, the Plan would have resulted in restraints that were reasonable and related to A.B.'s educational purposes.  *See Couture*, 535 F.3d at 1255.  However, it is undisputed that Michaels did not follow the Plan.  The Plan called for use of the Restraint Chair only as a last resort and for a maximum of five minutes.  Michaels used the Restraint Chair far more often and far longer than called for in the Plan.  The fact that Michaels violated A.B.'s Fourth Amendment rights after receiving training and instruction on the Plan goes to whether Rice adequately supervised Michaels; it does not show that the Plan itself was the moving force behind the constitutional violation.

As a consequence, no reasonable juror could find that the Plan—as designed by Rice—was the moving force behind Michaels's violation of A.B.'s Fourth Amendment rights.  As such, Plaintiffs' have failed to show a trial-worthy issue as to their unconstitutional policy claim against Rice.

### 3.   Failure to Train and/or Supervise

Plaintiffs also allege that Rice violated A.B.'s Fourth Amendment rights by failing to adequately train and/or supervise the Life Skills staff.  Failure to supervise and failure to train are treated the same in the Tenth Circuit.  *Whitewater v. Goss*, 192 F. App'x 794, 797 (10th Cir. 2006).  To succeed on their failure to train and/or supervise claim, Plaintiffs must demonstrate the supervisor's inaction was the result of deliberate indifference.  *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006).  In addition to meeting the strict deliberate indifference standard, the plaintiff must also make a strong causation showing. There must be a direct causal link between the challenged action

(or inaction) and the specific constitutional deprivation, such that the defendant, through her deliberate conduct, is the moving force behind the injury alleged.  *Bd. of the County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

        a.     Deliberate Indifference

Deliberate indifference means more than simple or even heightened negligence.  It requires "an act or omission purposefully committed by a person who must have realized that the conduct was unnecessarily dangerous or which conduct was done heedlessly or recklessly, without regard to the consequences, or without regard to the rights and safety of others."  *Zuchel v. City and Cty. of Denver*, 997 F.2d 730, 735 (10th Cir. 1993).

Rice has acknowledged that she was responsible for supervising the programming in A.B.'s classroom and was also responsible, in conjunction with Burke, for supervising Michaels and the paraprofessionals on the Life Skills staff.  (Rice Dep. at 40.)  Rice provided Michaels and the Life Skills paraprofessionals with training on how to use restraints on students, and particularly on how to implement the Plan she devised for A.B.  (*Id*. at 40-41.)

Defendants argue that Rice did not know that Michaels was using the Restraint Chair in a manner inconsistent with the behavior plan.  (ECF No. 79 at 18.)  However, the evidence would permit a reasonable juror to conclude otherwise.  During the second week of school, Lloyd told Rice that A.B. was being strapped into the Restraint Chair for the whole time she was in the classroom.  (Lloyd Dep. at 27.)  Lloyd later reiterated her concerns with Rice on at least six or seven different occasions.  (Lloyd Dep. at 26.)  Trowbridge also personally spoke with Rice about an incident in which Michaels kept

A.B. in the Restraint Chair for more than fifteen minutes.  (Trowbridge Dep. at 98-99.)

In November 2006, Odessa Hubbard submitted a written complaint to Rice about how

Michaels would strap A.B. into the Restraint Chair.  (Rice Dep. at 112.)

Thus, viewing the evidence in the light most favorable to Plaintiffs, Rice knew

about Michaels's misuse of the Restraint Chair since sometime in September 2006.  It

is undisputed that Rice did nothing to address the issue until the investigation was

launched by The Legal Center in December 2006 or January 2007.  (Rice Dep. at 104-

114.)  Rice chose not to investigate the complaints because she assumed Michaels

was using the chair in accordance with her instructions.  (Rice Dep. at 114-15.)   Rice

did not follow up with Michaels to confirm that her assumption was, in fact, true.  After

The Legal Center intervened, Rice instructed all teachers in the Life Skills program to

stop using the Restraint Chair on any student unless it was required for therapy

purposes.  (Rice Dep. at 128.)

On this record, the Court finds that Plaintiffs have shown a trial-worthy issue as

to whether Rice was deliberately indifferent to the ongoing violation of A.B.'s Fourth

Amendment rights and therefore liable under a failure to train and/or supervise theory.

b.    Causal Connection

"A supervisor is not liable under section 1983 unless an affirmative link exists

between the [constitutional] deprivation and ... the supervisor's '... failure to supervise.' "

*Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988).  Rice was first on notice of

Michaels's misuse of the Restraint Chair early in the school year.  Because she failed to

investigate Lloyd's complaints, Michaels continued to restrain A.B. to the chair for hours

every day.  Michaels testified that she believed she was following Rice's behavioral plan

when she was restraining A.B.  (Michaels Dep. at 63.)  Therefore, it is reasonable to infer that, had Rice chosen to follow up on the initial complaints of misconduct, she could have stopped Michaels from misusing the Restraint Chair.  Thus, the Court finds that Plaintiffs have shown a direct affirmative link between the violation of A.B.'s Fourth Amendment rights and Rice's failure to train and supervise Michaels.

   c. Was the constitutional violation clearly established?

  Rice has asserted qualified immunity as a defense to these claims.  Thus, she is liable only if her actions violated a clearly established constitutional right.  The Court finds that Rice's duty to supervise and train the employees was clearly established as of fall 2006.  In 1999, the Tenth Circuit held that a supervisor's inaction when confronted with an ongoing constitutional violation was a basis for supervisory liability.  *Johnson v. Martin*, 195 F.3d 1208, 1220 (10th Cir. 1999); *see also Meade*, 841 F.2d at 1528-29 (discussing supervisory liability predicated on the failure to train and supervise employees); *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) (knowledge of and acquiescence to a constitutional violation is sufficient for supervisory liability); *Woodward v. City of Worland*, 977 F.2d 1392, 1399-1400 (10th Cir. 1992) (knowing acquiescence to constitutional violation was deliberate indifference).

  Because a reasonable juror could find that Rice's failure to adequately train and/or supervise Michaels resulted in the violation of A.B.'s constitutional rights, and the duty to train and/or supervise was clearly established, Rice is not entitled to qualified immunity on this claim.  Defendant Rice's Motion for Summary Judgment is therefore denied as to Plaintiff's Fourth Amendment claim against her.

Jean Burke

There is no allegation that Burke ever personally strapped A.B. into the Restraint Chair.  Rather, the claim against Burke is that she was principal of Lansing Elementary when A.B. was subjected to the restraint and that she knew about the violation of A.B.'s right and failed to intervene.  Thus, Plaintiffs' claims against Burke are brought in her supervisory capacity for failure to train and/or supervise Michaels.

Under Colorado law, a school principal assumes administrative responsibility and instructional leadership for the "planning, management, operation, and evaluation of the educational program of the schools to which he is assigned."  Colo. Rev. Stat. § 22-32-126.  Burke has acknowledged that she was responsible for the students' "physical and emotional welfare" and also for "providing the most sound instructional program" for every kid.  (Burke Dep. at 34.)

Defendants argue that, at most, Burke knew some paraprofessionals in A.B.'s classroom had concerns with the use of the Restraint Chair.  Defendants claim that "Burke's awareness that there were concerns does not amount to knowledge of a serious risk of constitutional harm to A.B. on which Burke should have taken different action."  (ECF No. 79 at 18.)

The evidence shows that Burke received a complaint about Michaels's use of the Restraint Chair from Lloyd early in the school year.  (Burke Dep. at 76.)  On the second day that A.B. was strapped into the Restraint Chair, Lloyd had a personal meeting with Burke during which she told Burke about Michaels's use of the Restraint Chair on A.B. (Lloyd Dep. at 23-24.)  Burke promised to check out the situation.  (*Id*. at 24.)  After that initial meeting, Lloyd had over a dozen face-to-face conversations with Burke about

"what was going on in the classroom". (*Id*. at 24-25.)

Burke also has acknowledged receiving complaints from Trowbridge and Hubbard about Michaels and the use of the Restraint Chair. (Burke Dep. at 54-55; Trowbridge Dep. at 81.) In response to these complaints, Burke told the complainants that she would talk to Michaels about it. (Trowbridge Dep. at 82.) Burke did not investigate the complaints in any manner. (Burke Dep. at 99-100.) Burke did not personally confront Michaels about the use of the Restraint Chair or ask her to stop using it. (Burke Dep. at 87-88.)

The Court finds that Plaintiffs have shown a genuine issue of material fact as to whether Burke failed to adequately train and supervise Michaels. Plaintiffs have put forth sufficient evidence to show that Burke had knowledge of Michaels's misuse of the Restraint Chair and failed to act on those complaints. A reasonable juror could conclude that Burke was deliberately indifferent to the ongoing violation of A.B.'s rights and that such indifference caused additional harm to A.B.

Burke also asserts qualified immunity. Therefore, she is liable for these constitutional violations only if they were clearly established at the time they were committed. For the reasons discussed above, the Court finds that they were. *See Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1249 (10th Cir. 1999) (acknowledging liability for failure to investigate); *Johnson*, 195 F.3d at 1220 (10th Cir. 1999) (liability based on a supervisor's inaction when confronted with an ongoing constitutional violation).

Because Plaintiffs have shown a disputed factual issue with respect to a clearly established right, Burke is not entitled to qualified immunity from Plaintiffs' claim that

Burke failed to adequately supervise and train Michaels and failed to adequately investigate the claims against Michaels.  Burke's Motion for Summary Judgment is therefore denied as to Plaintiffs' Fourth Amendment claim.

Laura Munro and John Barry

In fall 2006, Munro was Director of Diverse Learners and Rice's supervisor at the time she developed and implemented A.B.'s behavioral plan.  (Rice Dep. at 37.)  Barry was Superintendent of the District.  Therefore, to some degree, both had oversight of the Lansing Life Skills program.

However, there is no evidence that Munro or Barry had any knowledge about the use of the Restraint Chair prior to The Legal Center's intervention.  Deliberate indifference requires actual or constructive knowledge of an ongoing harm.  *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  The Court finds that no reasonable juror could find that Munro or Barry had actual or constructive knowledge of Michaels's use of the Restraint Chair prior to December 2006.  Moreover, Plaintiffs have failed to show an affirmative link between any action of these two Defendants and the violation of A.B.'s Fourth Amendment rights.

Accordingly, Plaintiffs have failed to show a trial-worthy issue as to whether Defendants Munro and Barry are liable for a violation of A.B.'s Fourth Amendment right and their Motion for Summary Judgment is granted with respect to this claim.

The District

To succeed on their Fourth Amendment claim against the District, Plaintiffs must show either: (1) the person who inflicted the constitutional harm was acting pursuant to an official District policy, practice or custom; (2) the constitutional tort-feasor had final

decision-making authority for the District; or (3) the District failed to adequately train or supervise its employees.  *City of St. Louis v. Proprotnik*, 485 U.S. 112, 123 (1988).  Plaintiffs argue that the District had an unconstitutional policy and that it failed to adequately train and supervise its employees.  (ECF No. 98 at 25-26.)

Plaintiffs argue that the behavior plan devised by Rice on behalf of the District was unconstitutional.  As discussed above, the Court disagrees.  Had Michaels implemented the plan as Rice had instructed her, there would have been no constitutional violation.  Under *Couture*, restraining A.B. in the chair for no longer than five minutes after trying other measures would not have been an unreasonable seizure.  *See* 535 F.3d at 1254-55.  It was only Michaels's misuse of the Restraint Chair that arguably resulted in a constitutional violation.  Thus, Plaintiffs have failed to show that the District had an unconstitutional policy, practice or custom.

Plaintiffs have also failed to show that a final decision-maker violated A.B.'s constitutional rights.  There is no evidence that Michaels, Rice or Burke were final decision-makers.  Though Burke was likely the decision-maker for her school, she was not the decision-maker for the District so as to subject the District to liability.

Thus, Plaintiffs can succeed only by showing that the District failed to adequately train or supervise its employees.  To succeed on this claim, Plaintiffs have to show that the District knew that its training of Michaels was so inadequate that it was likely to result in a violation of A.B.'s constitutional rights or that a final policy-maker was deliberately indifferent to the constitutional violation.  *Brown v. Gray*, 227 F.3d 1278, 1289 (10th Cir. 2000).  Plaintiffs have failed to satisfy this burden.  As discussed above, there is no evidence that the District officials knew that Michaels was failing to follow

Rice's behavioral plan.  There is also no evidence that any final policy-maker knew about the ongoing use of the Restraint Chair.

Plaintiffs have failed to show a trial-worthy issue as to whether the District is liable for a violation of A.B.'s Fourth Amendment rights.  Accordingly, Defendants' Motion for Summary Judgment is granted in so far as it seeks judgment in favor of the District and the Board on Plaintiffs' Fourth Amendment claims.

Conclusion

Plaintiffs have shown a trial-worthy issue as to whether Defendants Michaels, Rice, and Burke violated A.B.'s Fourth Amendment rights.  Accordingly, Plaintiffs' claims against these three Defendants will proceed to trial.  However, Plaintiffs have failed to show a Fourth Amendment violation by Defendants Barry, Munro, Trowbridge, Hubbard or the District and the Board.  Summary judgment in favor of these Defendants on Plaintiffs' Fourth Amendment claims is therefore granted.

**C.     Fourteenth Amendment**

The Fourteenth Amendment provides in part that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within the jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  Plaintiffs bring three causes of action that arise under the Fourteenth Amendment: (1) substantive due process; (2) procedural due procedural; and (3) equal protection.

1.     Substantive Due Process

Plaintiffs allege that Defendants violated A.B.'s constitutionally protected liberty

interest in personal security, bodily integrity, and freedom from unjustified intrusions on personal security, including bodily restraint and punishment.  (Compl. ¶ 110.)

A substantive due process claim is "founded upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998). The concept of substantive due process is not fixed or final, *Rochin v. California*, 342 U.S. 165, 170 (1952), but generally is accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.  *See Albright v. Oliver*, 510 U.S. 266 (1994); *see also Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) ("As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.").

The standard for judging a substantive due process claim is whether the challenged government action would "shock the conscience of federal judges." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998).  To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Id.*  Instead, a plaintiff "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.*  "A substantive due process violation must be something more than an ordinary tort to be actionable under § 1983." *Abeyta By and Through Martinez*, 77 F.3d 1253, 1257 (10th Cir. 1996).

The Supreme Court has held that "corporal punishment in public schools implicates a constitutionally protected liberty interest." *Ingraham v. Wright*, 430 U.S. 651, 672 (1977).  The Tenth Circuit has held that "the substantive due process inquiry in school corporal punishment cases must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Garcia ex rel. Garcia v. Miera*, 817 F.2d 650, 653 (10th Cir. 1987).

a.   Michaels

Michaels asserts qualified immunity from Plaintiffs' substantive due process claims.  For purposes of the instant Motion, the Court assumes that Plaintiffs have shown that Michaels violated A.B.'s substantive due process rights by restraining her in a chair for hours every day.  Because Michaels has asserted qualified immunity, Plaintiffs' claim can survive summary judgment only if the constitutional violation was clearly established at the time of the abuse.

Plaintiffs' opposition to Michaels's summary judgment motion ignores the requirement that the constitutional violation be clearly established.  The only cases cited with respect to Plaintiffs' substantive due process claim appear in the legal standard portion of their opposition and are easily distinguishable from the facts at issue here. The only case cited by Plaintiffs that specifically involves the substantive due process rights of a student is *Garcia*, 817 F.2d 650.  In *Garcia*, a principal beat a nine-year-old girl with paddle so hard that blood soaked through the girl's clothes and she suffered permanent scarring; the principal later beat the child again even after her parents asked

the principal not to strike her without calling them first. *Id*. at 652-54. The Court finds that the allegations of physical abuse in *Garcia* are so much more egregious than the allegations here that *Garcia* would not have put a reasonable person in Michaels's position on notice that her actions violated A.B.'s substantive due process rights.

The Court has conducted its own limited review of the case law as it existed in fall 2006 and finds that the law was not clearly established with respect to the fact that strapping A.B. into the Restraint Chair on a daily basis violated her substantive due process rights. The Court could not locate a case that had substantially similar facts. As previously noted, *Couture* was not decided until two years later. In the cases with the most similar facts, the Tenth Circuit held that there was no substantive due process violation. *See Harris v. Robinson*, 273 F.3d 927, 931 (10th Cir. 2001) (a teacher who ordered a mildly to moderately retarded ten-year-old boy to clean out the toilet with his bare hands was not conscience-shocking because her actions were not inspired by malice or sadism and the boy was not subjected to appreciable pain); *Abeyta*, 77 F.3d 1253, 1257 (10th Cir. 1996) (it was not conscience-shocking for a teacher to call a twelve-year-old girl a prostitute in front of the class repeatedly over the course of several weeks and allow other students to do the same).

Accordingly, the Court finds that, in fall 2006, a reasonable person in Michaels's position would not have known that putting A.B. in the Restraint Chair for multiple hours each day violated A.B.'s substantive due process rights. Thus, Michaels is entitled to qualified immunity from Plaintiffs' substantive due process claim. Michaels's Motion for Summary Judgment is therefore granted as to this claim.

      b.     Other Individual Defendants

Viewing the facts in the light most favorable to Plaintiffs, it is clear that the most egregious behavior in this case was Michaels's use of the Restraint Chair for multiple hours on a daily basis.  The allegations against the other Individual Defendants pale in comparison to the allegations against Michaels.  The Court has found that judgment in favor of Michaels on Plaintiffs' substantive due process claim is appropriate because it was not clearly established that her actions would shock the judicial conscience.  If Michaels's actions did not violate clearly established law, then the Court has no problem concluding that the remaining Individual Defendants' actions failed to violate A.B.'s clearly established substantive due process rights.  Thus, the remaining Individual Defendants are entitled to qualified immunity from Plaintiffs' substantive due process claims.  Summary judgment is therefore granted in favor of Barry, Munro, Rice, Burke, Trowbridge, and Hubbard on Plaintiffs' substantive due process claims.

      c.     District

The defense of qualified immunity is available only to individual defendants and therefore does not apply to Plaintiffs' claims against the District.  *Owen v. City of Independence*, 445 U.S. 622 (1980).  Thus, the Court must determine if the District violated A.B.'s constitutional rights regardless of whether any such violation was clearly established.

Plaintiffs argue that the Plan designed by Rice was District policy and that this Plan violated A.B.'s substantive due process rights. (ECF No. 98 at 7.)  The Plan that called for an escalating continuum of restraint for the purpose of getting A.B. to focus on her classroom activities.  The Plan had three stages and, if properly implemented, a

teacher would only mechanically restrain A.B. if she would not stay seated in a time-out chair on her own and had not calmed down after five minutes in a modified baskethold. Under the plan, the maximum amount of time that A.B. was to spend in the Restraint Chair was five minutes.

The Court finds that the Plan—as designed by Rice—does not shock the judicial conscience.  Accordingly, the District's Motion for Summary Judgment is granted as to Plaintiffs' substantive due process claim.

2.    Procedural Due Process

The Supreme Court has held that "[a]n essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and an opportunity for hearing appropriate to the nature of the case.' " *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1984) (citation omitted).  A plaintiff alleging a claim under procedural due process must show:  (1) that he possessed a constitutionally protected liberty or property interest; and (2) that he was not afforded an appropriate level of process.  *Couture*, 535 F.3d at 1256 (citation omitted).

In *Goss v. Lopez*, the Supreme Court recognized public education as a property interest entitled to protection by the Due Process Clause.  419 U.S. 565, 574 (1975). The Court held:

> When complete deprivation of education occurs, such as when a student is removed from the school for a lengthy time period, . . . the student at minimum is entitled to "notice and . . . some kind of hearing," though the "timing and content of the notice and the nature of the hearing will depend on the appropriate accommodation of competing interests involved."

*Id.* at 578-79.  However, due process is not invoked where the interference with a student's property interest is *de minimis*.  *Id.* at 576.

In *Goss*, the Court found that a ten day suspension from school constituted "total exclusion from the educational process," and was therefore unconstitutional. *Id.* In *Couture*, the Tenth Circuit held that use of a timeout room did not violate due process. "While the child is temporarily removed from the classroom, any loss of a property right is *de minimis* and not subject to procedural protections." *Couture*, 535 F.3d at 1257.

The deprivation here is more akin to that in *Goss* than *Couture*. The evidence shows that A.B. was restrained to a chair for most of the time that she was at school. (Lloyd Dep. at 34.) Two or three days a week, Michaels would face the Restraint Chair towards a wall and put an obstruction behind and to the side of A.B. (*Id.* at 34-35.) Thus, for all intents and purposes, A.B. was deprived of her right to participate in educational activities for two or three days a week. This constitutes deprivation of her property right to a public education.

To satisfy due process, the notice provided prior to the deprivation must be "tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard, to insure that they are given a meaningful opportunity to present their case." *Watson v. Beckel*, 242 F.3d 1237, 1240 (10th Cir. 2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 349 (1976)). There is no evidence that Plaintiffs received notice and an opportunity to be heard with respect A.B.'s deprivation of the right to her education. Though there was some discussion with B.S. about using a chair to keep A.B. focused, there was never any discussion of restraining A.B. or blocking her off from the classroom entirely. To the extent B.S. was aware of the restraint at all, she believed that A.B. was being put in a device akin to a high chair. (B.S. Dep. at 78-80.)

A.B.'s mother only learned that A.B. was being strapped to the Restraint Chair when she was contacted by The Legal Center.

Thus, the Court finds that Plaintiffs have shown a trial-worthy issue as to whether Michaels denied A.B. her right to a public education without due process.  The Court further finds that A.B.'s procedural due process rights were clearly established in fall of 2006.  *See Goss*, 419 U.S. at 578 (right to public education is a protected property interest); *Watson*, 242 F.3d at 1240 (at a minimum, due process requires notice and an opportunity to be heard before depriving one of his right to a public education).  The Court finds, therefore, that Michaels is not entitled to qualified immunity on Plaintiffs' procedural due process claim.  As a consequence, Michaels's Motion for Summary Judgment is denied as to Plaintiffs' Fourteenth Amendment procedural due process claim.

However, Plaintiffs have failed to show that any of the remaining Defendants violated her procedural due process rights.  Plaintiffs have failed to allege any personal action by Burke, Munro or Barry that interfered with A.B.'s right to an education.  The policy designed by Rice did not call for A.B. to be kept in the Restraint Chair longer than five minutes.  Had the policy been properly implemented, any deprivation of A.B.'s property interest in her education would have been *de minimis*.  Hubbard and Trowbridge placed A.B. into the Restraint Chair only once or twice for a few minutes each time.  Any deprivation caused by this disruption to A.B.'s education was *de minimis*.  Accordingly, Plaintiffs have failed to establish a genuine dispute as to whether any of these Defendants denied A.B. of a protected property interest without due process of the law.

The District argues that Plaintiffs' procedural due process claim against it fails because no official policy caused A.B.'s deprivation and the deprivation was not carried out by a final decision-maker.  The Court agrees.  Michaels was not acting pursuant any official or unofficial District policy when she faced A.B.'s Restraint Chair towards the wall and erected barriers around her.  Moreover, Michaels is not a final decision-maker whose actions can be attributed to the District.  As such, Plaintiffs have failed to show a disputed issue of fact as to whether the District violated A.B.'s procedural due process rights.

Accordingly, summary judgment is granted in favor of all Defendants other than Michaels on Plaintiffs' procedural due process claim.

3.    Equal Protection

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Plaintiffs pursue an equal protection claim under the "class of one" theory.  (ECF No. 98 at 37.)  Under this theory, Plaintiffs must first establish that others "similarly situated in every material respect" were treated differently.  *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1210 (10th Cir. 2006).  "A plaintiff must then show this difference in treatment was without rational basis, that is, the government action was irrational and abusive, and wholly unrelated to any legitimate state activity.  *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011) (internal quotations and citations omitted).  This standard is

objective—if there is a reasonable justification for the challenged action, the Court
should not inquire into the defendant's actual motivations. *Id*.

The "similarly situated" requirement is an "exacting burden". *Jicarilla*, 440 F.3d at
1213. To be "similarly situated" the individuals "must be *prima facie* identical in all
relevant respects or directly comparable in all material respects; although this is not a
precise formula, it is nonetheless clear that similarly situated individuals must be very
similar indeed." *U.S. v. Moore*, 543 F.3d 891 (7th Cir. 2008).

Plaintiffs have failed to meet their burden of showing that A.B. was similarly
situated to any other students. Plaintiffs argue that A.B. was similarly situated to the
other students in the Life Skills class but the evidence does not support this contention.
The behavior plan devised by Rice was created specifically for A.B. after Rice worked
with A.B. for two days. There is no evidence that other students had similar behavior
issues or any behavior management plan in place. Additionally, all of the students
operated under their own IEPs, each of which addressed that particular student's
different needs. The different behavior, education, and care plans in place for the
students in the Life Skills class makes them not similarly situated for purposes of the
showing an equal protection violation. *See Kansas Penn Gaming*, 656 F.3d at 1218.

Because Plaintiffs have failed to show that A.B. was treated differently than
someone similarly situated to her, Defendants are entitled to summary judgment on
Plaintiffs' equal protection claim. Summary judgment is granted in favor of all
Defendants as to Plaintiffs' equal protection claim.

**D.      Rehabilitation Act and Americans With Disabilities Act**

Plaintiffs bring claims against all Defendants for violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") and Title II of the Americans with Disabilities Act ("ADA").  There is no individual liability under either of these statutes, *see Montez v. Romer*, 32 F.Supp.2d 1235, 1241 (D. Colo. 1999), so Plaintiffs may proceed only against the District.

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ."  29 U.S.C.A. § 794(a). The Rehabilitation Act defines "program or activity" to include "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . any part of which is extended Federal financial assistance."  29 U.S.C.A. § 794.  The Rehabilitation Act served as the model for the ADA.  *Montez*, 32 F. Supp. 2d at 1239.

"Broader than the Rehabilitation Act, the ADA extends similar protections and prohibitions against discrimination to all state and local government services, programs, and activities, regardless of whether they receive federal financial assistance."  *Id.* (citation omitted).  The ADA provides, "no qualified individual with a disability, shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C.A. § 12132.  A public entity under the ADA includes "any

State or local government; [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C.A. § 12131. "As a general matter, courts have construed the Rehabilitation Act and the ADA similarly."  *Montez*, 32 F. Supp. 2d at 1239 (citation omitted).  Congress has indicated that the ADA should be interpreted in a manner consistent with the Rehabilitation Act. *See* 42 U.S.C.A. §§ 12134, 12201.  The Court will therefore review Plaintiffs' claims under the Rehabilitation Act and the ADA together. *See Miller v. Bd. of Educ.*, 565 F.3d 1232, 1245-46 (10th Cir. 2009).

To succeed on these claims, a plaintiff must show:  (1) she is handicapped under the Act; (2) she is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff."  *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008).

The only prong of this test challenged by the District is the fourth one.  The District argues that there is no evidence it discriminated against A.B. based on her disability.  (ECF No. 79 at 31.)  However, the evidence shows that the District devised A.B.'s behavior management plan to deal with her disability and that such plan called for her to be strapped into the Restraint Chair.  A.B. was denied the opportunity to participate in classroom activities while strapped into this chair, especially when Michaels faced the chair to the wall and erected barriers around her.  Thus, Plaintiffs have established a *prima facie* case of statutory disability discrimination.

"To recover compensatory damages under § 504, a plaintiff must establish that the agency's discrimination was intentional."  *Barber v. Colo. Dep't of Trans.*, 562 F.3d

1222, 1228 (10th Cir. 2009).  Intentional discrimination does not require a showing of personal ill will or animosity toward the disabled person; rather, "intentional discrimination can be inferred from a defendant's deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights."  *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999).  In this context, the test for deliberate indifference "comprises two prongs: (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'"  *Barber*, 562 F.3d at 1229 (quoting *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

Plaintiffs have come forward with some evidence that the District was deliberately indifferent to Michaels's discrimination against A.B.  At least two district employees that had supervisory roles, Burke and Rice, were repeatedly informed that Michaels was using the Restraint Chair in a manner that denied A.B. the right to participate in her education.  Despite these notifications, neither took any action to investigate or remedy the behavior.  Thus, Plaintiffs have shown a trial-worthy issue as to whether the District violated Section 504 and Title II of the ADA.  The District's and the Board's Motion for Summary Judgment is denied as to these two claims.  However, summary judgment is granted in favor of all Individual Defendants on Plaintiffs' Section 504 and ADA claims.

**E.      Federal Bill of Rights for the Developmentally Disabled**

Claim Nine of Plaintiffs' Second Amended Complaint seeks relief under the federal Developmental Disabilities Assistance and Bill of Rights Act ("DDABR").  (ECF

No. 29 ¶¶ 186-192.)  Defendants move for summary judgment on this claim arguing

that DDABR does not confer a private right of action on Plaintiffs.  (ECF No. 79 at 33-

34.)  Plaintiffs do not respond to this argument.

As Defendants note, multiple courts have found that there is no private right of

action under the DDABR.  *See, e.g.,Martin v. Taft*, 222 F.Supp.2d 940, 966 (S.D. Ohio

2002); *Duncan v. Johnson-Mathers Health Care, Inc.*, 2010 WL 3000718, *11 (E.D. Ky.

July 28, 2010).  Accordingly, summary judgment is granted in favor of all Defendants on

Plaintiffs' claim under the DDABR.

## F.      Colorado's Protection of Persons from Restraint Act

Plaintiffs' Tenth claim alleges a violation of the Colorado Bill of Rights for the

Developmentally Disabled ("CBRDD").  (Am. Compl. ¶¶ 193-204.)  In 1975, the

Colorado Legislature enacted Senate Bill 135 commonly known as the "Bill of Rights for

the Developmentally Disabled" which creates a statutory right to treatment in the least

restrictive environment and requires that each facility in which developmentally disabled

people reside "implement a program so that each resident may live as normally as

possible."  Colo. Rev. Stat. § 27-10.5-101, 112.

CBRDD prohibits "service agencies" from mistreating, exploiting, neglecting or

abusing any person with a developmental disability.  Colo. Rev. Stat. § 27-10.5-115(2).

It prohibits the restraint of persons with a developmental disability for the purposes of

punishment, Colo. Rev. Stat. § 27-10.5-115(8), and requires review and oversight when

mechanical restraint is employed.  *Id*. at § 27-10.5-115(9).

The parties dispute whether the District qualifies as a "service agency".  "Service

agency" is defined in the statute as "an individual or any publicly or privately operated program, organization, or business providing services or supports for persons with developmental disabilities."  Colo. Rev. Stat. § 27-10.5-102(28).  The District contends that it is not a program, organization or business in any legal sense; rather, it is a political subdivision.  (ECF No. 79 at 34-35.)  The District argues that, when the Legislature intends to include school districts in a statutory scheme, it specifically includes them in the definition and the failure to do so here shows that the legislature did not intend to include school districts in the definition of "service agency."  (*Id*. at 35.)

The Court agrees.  Colorado law is clear that school districts are political subdivisions.  *Clear Creek Sch. Dist. RE-1 v. Holmes*, 628 P.2d 154, 155 (Colo. App. 1981) ("A school district is a political subdivision of the state").  When the legislature intends to include school districts within a statutory scheme, it explicitly does so. *See, e.g.,* Colo. Rev. Stat. § 24-34-401(3) (including "school districts" in definition of "employer" for purposes of the Colorado employment discrimination statutes); § 24-72-202(5) (including "school districts" in definition of "political subdivision" for purposes of the Colorado Open Records Act).  Most telling, however, is that CBRDD allows for school districts to purchase services and supports from "community centered boards or service agencies".  Colo. Rev. Stat. § 27-10.5-104(5).  The use of "school districts" and "service agencies" in the same section of the statute shows that the legislature did not intend to include school districts within the meaning of the term "service agencies."

Because the District is not a "service agency" within the meaning of article 10.5 of Title 27, Plaintiffs have failed to show a trial-worthy issue as to their claim under the CBRDD.  To the extent that Plaintiffs seek relief from any of the Individual Defendants,

they are also not service agencies under the statute.  As such, summary judgment is granted in favor of all Defendants on Plaintiffs' CBRDD claim.

**G.    Colorado's Protection of Persons from Restraint Act**

Plaintiffs' eleventh claim seeks redress from the District for violation of Colorado's Protection of Persons from Restraint Act ("CPPRA").  (Am. Compl. ¶¶ 205-215.)  Defendants move for summary judgment on the basis that CPPRA does not confer on Plaintiffs a private right of action.  (ECF No. 79 at 32-33.)

The parties agree that CPPRA does not explicitly include a private right of action. Thus, the Court must determine whether there is an implicit private right of action in the statute.  "Whenever a claimant alleges that a statute, ordinance, or regulation implicitly creates a private right of action, the critical question is whether the legislature intended such a result."  *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 923 (Colo. 1997). The Court considers three factors to determine if a particular plaintiff has an independent cause of action: (1) whether the plaintiff is within the class of persons intended to be benefitted by the legislative enactment; (2) whether the legislature intended to create, albeit implicitly, a private right of action; and (3) whether an implied civil remedy would be consistent with purposes of the legislative scheme.  *Id.* (citing *Allstate Ins. Co. v. Parfrey*, 830 P.2d 905, 910 (Colo. 1992)).

The CPPRA regulates when an agency (specifically defined to include school districts) can use physical, mechanical and chemical restraints.  Colo. Rev. Stat. § 26-20-103.  It imposes certain duties on an agency that uses restraints and mandates appropriate training, documentation and review when restraints are used. *Id*. at 104-

108.

The parties do not dispute that A.B. is within the class of individuals the CPPRA is intended to protect.  Defendants argue that there is no indication that the Colorado Legislature intended to create a private right of action.  The Court agrees.  One of the key indicators of when a legislature intends to create a private right of action is when a statute includes "rights-creating" language.  *See Alexander v. Sandoval*, 532 U.S. 175, 289 (2001).  The CPPRA does not have any language that suggests the legislature intended to confer any rights on a private person.  Rather, the statute focuses on the actions of the agency, proscribing when restraints can be used and what must occur before and after restraints are used.  The fact that the CPPRA's focus is on the agency being regulated instead of the individuals it seeks to protect shows that the legislature did not intend to create a private cause of action.  *Id*. ("Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons.").

Colorado courts do "not infer a private right of action based on a statutory violation unless [they] discern a clear legislative intent to create such a cause of action." *Gerrity*, 946 P.2d at 923.  There is no such clear legislative intent in this case.  Thus, the Court finds that CPPRA does not confer a private right of action on Plaintiffs.  Summary judgment is therefore appropriately granted in favor of all Defendants on Plaintiffs' claim under the CPPRA.

## H.   State Law Claims Against Individuals Defendants

Plaintiffs' claims twelve through nineteen bring the following causes of action

under Colorado common law against the Individual Defendants: (1) negligence; (2) negligent infliction of emotional distress; (3) assault; (4) battery; (5) false imprisonment; (6) extreme and outrageous conduct; and (7) invasion of privacy.

Because all of the Individual Defendants were employed by the District when the events at issue here occurred, Plaintiffs' state law claims are all subject to the Colorado Governmental Immunities Act ("CGIA"), Colo. Rev. Stat. § 24-10-101 *et seq.*  "A public employee is immune from liability on tort claims arising out of an act or omission of the employee during the performance of his or her duties and within the scope of his or her employment, unless the act or omission causing such injury was willful and wanton." *Carothers v. Archuleta Cty. Sheriff*, 159 P.2d 647, 650 (Colo. App. 2006) (citing Colo. Rev. Stat. § 24-10-118).  The phrase "willful and wanton" is not defined in the CGIA. However, the majority of Colorado courts to address this issue have applied the following definition contained in Colorado's exemplary damages statute:  Willful and wanton conduct is "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or the rights and safety of others, particularly the plaintiff[s]."  Colo. Rev. Stat. § 13–21–102(1)(b); *Zerr v. Johnson*, 894 F.Supp. 372, 376 (D. Colo. 1995); *Moody v. Ungerer*, 885 P.2d 200, 205 (Colo. 1994).

<u>Defendant Michaels</u>

The only basis for summary judgment asserted by Michaels is that Plaintiffs cannot show that she acted in a willful and wanton manner.  (ECF No. 76 at 18-20.) Michaels alleges that she restrained A.B. at the direction of her supervisor, with the permission from A.B.'s mother, and pursuant to statutory authority and, as such, any

restraint was not willful and wanton.

Michaels's arguments on summary judgment ignore the evidence of record against her.  Michaels contends that the evidence shows that she only utilized the Restraint Chair once or twice, ignoring Lloyd's testimony about observing Michaels restrain A.B. on a daily basis.  Michaels also contends that she had A.B.'s mother's permission to use the Restraint Chair.  The evidence shows only that A.B.'s mother consented to Michaels using a device similar to a high chair with a tray that would allow A.B. to participate in classroom activities.  There is no evidence that A.B.'s mother consented to restraining her daughter or to Michaels's placing barriers around A.B. for significant periods of time.  Finally, Michaels contends that she was simply following her supervisor's orders by using the Restraint Chair.  But Rice's behavior Plan called for the Restraint Chair to be used a maximum of five minutes.  The evidence shows that Michaels left A.B. restrained in the chair for significantly longer periods of time than called for by the Plan.

"Ordinarily determining whether a defendant's conduct is willful and wanton is a question of fact."  *U.S. Fire Ins. Co. v. Sonitrol Management Corp.*, 192 P.3d 543, 549 (Colo. App. 2008).  The Court finds that there is sufficient evidence in the record to allow a jury to conclude that Michaels's use of the Restraint Chair was willful and wanton.  There is evidence that MIchaels restrained A.B. for hours every day, faced the Restraint Chair against the wall, then erected barriers to cut A.B. off from the rest of the classroom.  There is some evidence that when A.B. would yell and scream, Michaels would tell her to "shut up" and instruct the paraprofessionals in the room not to help her.

The Court acknowledges that these facts are heavily disputed by the parties.

But on summary judgment, it must view all facts in the light most favorable to Plaintiffs. Viewing the facts from that perspective, the Court concludes that a jury could find that Michaels's actions were willful and wanton.  As such, Michaels is not entitled to summary judgment on this basis.  Because Michaels has not asserted any additional basis for why she is entitled to summary judgment on the state law claims, all of the state law claims will proceed against her.

Accordingly, Michaels's Motion for Summary Judgment is denied as to Plaintiff's common law claims.

<u>Defendants Hubbard and Trowbridge</u>

Defendants Hubbard and Trowbridge move for summary judgment as to all of Plaintiffs' state law claims against them and argue that Plaintiffs cannot show a trial-worthy issue as to whether they acted wilfully or wantonly.  (ECF No. 79 at 37-40; ECF No. 74 at 14.)

The record shows that, at most, Hubbard and Trowbridge each restrained A.B. in the chair once or twice for a couple of minutes at the instruction of Michaels, the lead teacher for the Life Skills classroom.  Both of them believed they were acting in accordance with a behavior plan devised by Rice and with A.B.'s mother's permission. Even assuming that these actions constituted a tort against A.B., there is no evidence to suggest that Hubbard or Trowbridge acted willfully or wantonly.  *See Terror Mining Co. v. Roter*, 866 P,2d 929, 934 (Colo. 1994) (a showing of willful and wanton requires that a plaintiff present facts showing that defendant "purposefully pursued an activity that he had considered, more likely than not, would result in" the alleged wrong).  As such, Plaintiffs' state law tort claims against them are barred by the CGIA.

Accordingly, Hubbard and Trowbridge's Motions for Summary Judgment are granted as to Plaintiff's common law claims.

Defendants Rice, Burke, Munro, and Barry

Similarly, there is no evidence that Rice, Burke, Munro or Barry ever personally restrained A.B., much less in a willful or wanton manner. To the extent Plaintiffs attempt to hold these Defendants liable for the actions of subordinate employees, such is not permitted by the CGIA. *See* Colo. Rev. Stat. § 24-10-118(2)(a) (removing immunity only against the employee who acts in a willful and wanton manner). Because Plaintiffs have failed to show any personal participation by Rice, Burke, Munro or Barry in the acts underlying all of their state law tort claims, and these Defendants are immune from any claims against them in their supervisory capacity, Plaintiffs have failed to show any trial-worthy issue on these claims.

Accordingly, the Motions for Summary Judgment filed by Rice, Burke, Munro, and Barry are granted as to Plaintiffs' common law claims.

## I.     Respondeat Superior Against the District

Plaintiffs allege that the District is vicariously liable for the torts committed by its employees under the doctrine of *respondeat superior*. (Am. Compl. ¶¶ 257-61.) "A public entity is entitled to immunity under § 24–10–106 unless the claimant's injuries result from one of the specific circumstances—such as operation of a motor vehicle or the presence of various dangerous conditions—enumerated in that statute for which sovereign immunity is waived. If the conduct does not fall within one of the . . . § 24–10–106 waiver categories, a public entity cannot be deemed to have waived

sovereign immunity by virtue of its own willful and wanton conduct." *Carothers*, 159 P.3d at 650. "Further, a public entity is not liable for the willful and wanton conduct of its employees unless the conduct falls within one of the waiver provisions of § 24–10–106." *Id*. (citing *Ramos v. City of Pueblo*, 28 P.3d 979 (Colo. App. 2001)).

None of the conduct at issue here falls within one of the categories set forth in § 24-10-106. Accordingly, the Court finds that the District's sovereign immunity from suit has not been waived in this case, and that the District is entitled to summary judgment on Plaintiffs' *respondeat superior* claim.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Defendant Donna Trowbridge's Motion for Summary Judgment (ECF No. 74) is GRANTED IN FULL;

2.  Defendant Vicki Michaels's Motion for Summary Judgment (ECF No. 76) is GRANTED IN PART and DENIED IN PART;

3.  The Motion for Summary Judgment filed by the Defendants District, Board, Barry, Burke, Rice, Hubbard and Munro is GRANTED IN PART and DENIED IN PART;

4.  Summary judgment is GRANTED in favor of Defendants Trowbridge, Hubbard, Munro, Barry, the District and the Board but DENIED as to Defendants Michaels, Rice and Burke on Plaintiffs' Fourth Amendment claim;

5.  Summary judgment is GRANTED in favor of all Defendants on Plaintiffs' Second Claim for Relief alleging violation of A.B.'s substantive due process rights;

6.     Summary judgment is GRANTED in favor of Defendants Trowbridge, Hubbard, Munro, Barry, Rice, Burke, the District and the Board but DENIED as to Defendant Michaels on Plaintiffs' Third Claim for Relief alleging violation of A.B.'s procedural due process rights;

7.     Summary Judgment is GRANTED in favor of all Defendants on Plaintiffs' Fourth Claim for Relief alleging violation of A.B.'s equal protection rights;

8.     Summary Judgment is GRANTED in favor of Defendants Barry, Munro, Rice, Burke, Michaels, Trowbridge and Hubbard but DENIED as to the District and the Board on Plaintiffs' Sixth and Seventh Claims for Relief arising out of the Rehabilitation Act and the Americans with Disabilities Act;

9.     Summary Judgment is GRANTED in favor of all Defendants on Plaintiffs' Ninth Claim for Relief arising out of the Federal Bill of Rights for the Developmentally Disabled;

10.     Summary Judgment is GRANTED in favor of all Defendants on Plaintiffs' Tenth Claim for Relief arising out of the Colorado Bill of Rights for the Developmentally Disabled;

11.     Summary Judgment is GRANTED in favor of all Defendants on Plaintiffs' Eleventh Claim for Relief arising out of the Colorado Protection of Persons from Restraint Act;

12.     Summary Judgment is GRANTED in favor of Defendants Barry, Munro, Rice, Burke, Trowbridge and Hubbard but DENIED as to Defendant Michaels on Plaintiffs' common law state claims (Causes of Action Twelve through Nineteen);

13.     Summary Judgment is GRANTED in favor of the District and the Board on

Plaintiffs' Twentieth Claim for Relief;

14.     Plaintiffs' claims against the Individual Defendants in their official capacities are DISMISSED;

15.     John Barry, Laura Munro, Donna Trowbridge, and Odessa Hubbard are DISMISSED as Party-Defendants from this action;

16.     The case shall proceed to trial on the following claims:

    a.      Plaintiffs' Fourth Amendment direct liability claim against Michaels;

    b.      Plaintiffs' Fourth Amendment supervisory liability claims against Burke and Rice;

    c.      Plaintiffs' Procedural Due Process Clause claim against Michaels;

    d.      Plaintiffs' Rehabilitation Act and Americans with Disabilities Act claims against the District and the Board; and

    e.      Plaintiffs' state common law tort claims against Michaels.

Dated this 28th day of November, 2011.

BY THE COURT:

William J. Martínez
United States District Judge